### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAQUIBA SHARDAN GILLIS | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 22-3362 |
| | : | |
| NORRISTOWN STATE HOSPITAL | : | |

## MEMORANDUM

KEARNEY, J.                                                                October 18, 2023

A hospital employer fired a Black probationary employee after she did not recant her demonstrably false story about her role in a patient altercation even after reviewing the video tape of the altercation. The hospital disciplined, but did not fire, a white probationary employee who recanted his demonstrably false story about his role in a separate patient altercation. The hospital fired the Black probationary employee within a week of her allegedly filing harassment complaints with an outside state agency. The fired employee did not adduce evidence she filed this complaint with the state agency or the hospital knew of her alleged complaint to a state agency. The fired employee also could not show the disciplined (but not fired) white probationary employee is a fair comparator to her given he recanted his earlier false story, but she did not. They engaged in different levels of misconduct and had different discipline histories. The fired employee sued for racial discrimination and retaliatory firing. The hospital now moves for summary judgment. The employee did not respond. We studied the record. There is no genuine issue of material fact. The two probationary employees are not comparators as a matter of undisputed fact. There is also no evidence the hospital knew of the employee's alleged harassment complaint she claims to have filed with a state agency before it decided to fire her. We grant the hospital's motion for summary judgment.

I.   **Undisputed facts adduced in discovery.[1]**

Norristown State Hospital hired Black woman Naquiba Shardan Gillis and white man Michael McCullough as Forensic Security Employee Trainees on probationary civil service status on February 26, 2018.[2] Norristown State Hospital required the employees follow certain Department of Human Services Human Resources Policies.[3]

*The Hospital maintains an employee discipline policy.*

The Hospital follows Department of Human Services Human Resources Policy governing employee discipline.[4] The Hospital, following State Policy, sets disciplinary guidelines for "Deliberate concealment and/or misrepresentation of information" concerning an investigation and "[f]ailure to follow general instructions or procedures."[5] The Hospital may discharge the employee for their "first offense during probationary period" for "[d]eliberate concealment or misrepresentation of information" if the employee "repeatedly refuses to cooperate after having been clearly ordered to do so, warned that discipline will result if he/she refuses to answer/cooperate, and the employee had an opportunity to reflect upon the consequences of his/her actions for failing to do so."[6] The State recommends issuing a written reprimand or discharging the offending employee "if [the violation] is serious in nature" for "[f]ailure to follow general instructions or procedures" if the employee "was aware" of the "general instruction(s) or procedure(s) in question" and "failed to properly comply" with them.[7]

The Hospital asks patient abuse investigators to review and investigate alleged violations of Hospital Policy.[8] The patient abuse investigator forwards her findings to an investigation coordinator and the Hospital's Chief Executive Officer.[9] The coordinator and CEO determine whether the findings substantiate the alleged Policy violation.[10] The coordinator and CEO forward the Policy violation to Human Resources if the findings substantiate the alleged Policy

violation.[11] The Hospital's Human Resources Department develops charges for the alleged Policy violation and discusses the charges with the violating employee at a "Pre-disciplinary Conference."[12] The Human Resources Department and the CEO then determine the offending employee's discipline.[13]

### Mrs. Gillis's first warning.

Ms. Gillis first encountered discipline under the Hospital's Policy within one month of her start date in early 2018 for violating its Policy on employee leave.[14] Ms. Gillis arrived to work late within thirty days of her hiring.[15] The Hospital held a Pre-disciplinary Conference with Ms. Gillis on March 21, 2018 and Ms. Gillis gave a written statement.[16] The Hospital issued Ms. Gillis a "Final Warning" instructing further violations of the Hospital's Policy on leave would "have the probable consequence of your removal from employment."[17]

### Ms. Gillis's and Hospital's interactions in Fall 2018.

Ms. Gillis alleged but adduced no supporting evidence a supervisor brought Ms. Gillis and her "union president" into the supervisor's office on September 27, 2018 to report hearing a rumor Ms. Gillis performed "sexual favors for money" while working at the Hospital.[18] Ms. Gillis's supervisor told her she was not presently "in any trouble" but warned she would fire Ms. Gillis if the supervisor "found out the rumors were true."[19]

Ms. Gillis became at least partially involved in an altercation between a Hospital patient and a staff member involving threats of fighting each other on October 17, 2018.[20] Video surveillance confirmed the patient approached a staff member and threw a scarf in the staff member's face.[21] The staff member approached the patient and pointed to an open shower room.[22] Ms. Gillis and the staff member moved the patient into the open shower room.[23]

The Hospital investigated. Ms. Gillis provided a witness statement on November 19, 2018 detailing her account of the October 17, 2018 incident.[24] Ms. Gillis swore the patient threw a scarf at a staff member.[25] Ms. Gillis swore she did not see "[patient] or staff interact with each other."[26] Ms. Gillis swore she "did not hear [a staff member] challenge [patient] to fight in the shower room."[27]

The Nurse Manager interviewed Ms. Gillis on November 19, 2018.[28] The Nurse Manager reminded Ms. Gillis Hospital Policy requires Ms. Gillis "to be truthful and fully cooperate with the investigation."[29] Ms. Gillis stated she understood the Policy's truth-telling and cooperation requirements.[30] Ms. Gillis provided her initial witness statement to the Nurse Manager including swearing she did not see the patient and staff member interact.[31] The Nurse Manager showed Ms. Gillis video surveillance footage of the October 17, 2018 incident.[32] Ms. Gillis did not recant her story.[33]

Ms. Gillis alleges her supervisor monitored her shift on November 22, 2018 and asked Ms. Gillis about her failure to complete required tasks.[34] Ms. Gillis attributed the mistakes to her working a double shift the previous day.[35] Ms. Gillis's supervisor responded "I could be a bitch and write you up I'm going to put a note on your file as an official counseling you have been warned."[36] Ms. Gillis allegedly called the State Employee Assistance Program "a few times asking for help and assistance" following the November 22, 2018 encounter.[37] She adduced no evidence of these contacts. Ms. Gillis allegedly notified her supervisor Patrick Ellison of the November 22, 2018 incident.[38] She adduced no evidence of this notice either.

The Hospital issued a Pre-Disciplinary Conference Notice to Ms. Gillis on December 13, 2018.[39] The Hospital, through the Notice, described the surveillance footage from the October 17, 2018 patient incident as "verif[ying] that [Ms. Gillis was] in the immediate area at the time

and [Ms. Gillis'] immediately moved toward the two as the incident began then together with your coworker [Ms. Gillis] corralled the patient into the bathroom."[40] The Hospital, through the Notice, explained Ms. Gillis violated the Hospital's Policy as to honesty and charged Ms. Gillis with "Deliberate Concealment and/or Misrepresentation of Information in the Answering of Questions during an Official Investigation."[41]  Ms. Gillis provided a second sworn statement at the Pre-Disciplinary Conference swearing "her back was turned" during the incident and she intended to "stick[] to [her] original statement."[42] The Nurse Manager included both of Ms. Gillis's sworn witness statements when presenting the facts in her abuse investigation.[43]

Ms. Gillis allegedly filed "an official work place report" on January 4, 2019.[44] Ms. Gillis allegedly submitted her complaint to the State Employee Assistance Program.[45] Ms. Gillis alleges unidentified coordinators with the State Employee Assistance Program allegedly informed Ms. Gillis they forwarded her complaint to Hospital "director Richard Szczurowski" for investigation.[46] Ms. Gillis concludes Director Szczurowski knew of her harassment complaint.[47] Ms. Gillis did not adduce evidence of these allegations including no basis to find the Hospital including Director Szczurowski had a record of, or knew, of Ms. Gillis's alleged State Employee Assistance Program complaint.[48]

The Hospital fired Ms. Gillis on January 10, 2019 for violating its Policy as to honesty.[49] Hospital CEO Jessica Keith signed the letter terminating Ms. Gillis.[50] Several Hospital employees received a copy of the termination letter.[51] Director Szczurowski's name does not appear on the termination letter's copy list.[52] The Hospital explained Ms. Gillis gave an "[un]acceptable" response at her December 14, 2018 Pre-Disciplinary Conference by failing to change her original witness statement despite reviewing contrary surveillance footage

evidence.[53] The Hospital further advised Ms. Gillis's earlier violation of Hospital Policy provided "no reason to mitigate" her firing.[54]

### Mr. McCullough's and the Hospital's interactions in Fall 2018.

Ms. Gillis alleged the Hospital treated her differently than white male Forensic Security Employee Trainee Michael McCullough on probationary status also involved in a patient altercation in Fall 2018.

Mr. McCullough became involved in an altercation between a different patient and a different staff member on November 4, 2018.[55] The patient punched the staff member in her face near Mr. McCullough.[56] Mr. McCullough and another employee restrained the patient allowing the injured staff member to leave the hallway.[57]

The Hospital investigated. Mr. McCullough provided a witness statement on November 15, 2018 concerning the November 4, 2018 incident.[58] Mr. McCullough swore he and the staff member "redirected the patient" using an approved patient movement practice.[59]

The Hospital issued a Pre-Disciplinary Conference Notice to Mr. McCullough on December 31, 2018.[60] The Hospital, through the Notice, described the surveillance footage from the November 4, 2018 patient incident as depicting a staff member "utiliz[ing] a prohibited practice to move the patient down the hall" and Mr. McCullough as standing "directly behind [the staff member] during this time and a witness to these actions."[61] The Hospital, through the Notice, explained Mr. McCullough violated the Hospital's Policy as to honesty and charged Mr. McCullough with "Deliberate Concealment or Misrepresentation of Information and Failure to Follow General Procedures/Policies."[62] The Hospital scheduled Mr. McCullough's Pre-Disciplinary Conference on January 2, 2019.[63]

6

Mr. McCullough recanted his story in a second witness statement.[64] Mr. McCullough changed his original statement and recanted his assertion he used an approved patient movement practice.[65] The Hospital still disciplined Mr. McCullough; it issued Mr. McCullough a Written Reprimand on January 22, 2019 arising from the November 4, 2018 incident.[66] The Hospital charged Mr. McCullough with violating the Hospital's Policy by failing to follow its general instructions or procedures.[67] Several Hospital employees received a copy of Mr. McCullough's Written Reprimand.[68] Director Szczurowski's name does not appear on the Written Reprimand's copy list.[69] The Reprimand served as a "Final Warning" stating "[r]epeated offenses of the same or similar nature that occur at any point after the date of your receipt of this letter will have the probable consequence of your removal from employment."[70] The Hospital has no record of other Policy violations by Mr. McCullough.[71]

### *Ms. Gillis responds with harassment complaints and sues the Hospital.*

Ms. Gillis responded to her January 10, 2019 firing by disclosing her report to the State Employee Assistance Program in an Employment Discrimination Questionnaire she filed with the Pennsylvania Human Relations Commission on January 30, 2019.[72] The Hospital responded to Ms. Gillis's Pennsylvania Human Relations Commission filing on October 14, 2020.[73] Ms. Gillis neither pleads nor adduces evidence about the status of her Pennsylvania Human Relations Commission filing.

Ms. Gillis then pro se sued the Hospital allegedly engaged in race discrimination in firing her and retaliated against her for complaining about her supervisor in her January 4, 2019 complaint to the State Employee Assistance Program.[74] Ms. Gillis alleges the Hospital discriminated against her by "treat[ing] [Ms. Gillis] differently than a similarly situated white male employee."[75] Ms. Gillis alleges the Hospital retaliated against her by firing her within a

week of making her complaint to the State Employment Assistance Program.[76] We dismissed Ms. Gillis's retaliation claim predicated on her informal complaints to Ms. Bonetz, Supervisor Galen, and Supervisor Ellison.[77] We allowed Ms. Gillis to amend her retaliation claim and plead and adduce facts tying her alleged complaints to her termination.[78] She then claimed the retaliation arose from her alleged complaints on January 4, 2019 and we allowed her to proceed into discovery on this claim.

## II.    Analysis

The Hospital moves for summary judgment arguing Ms. Gillis cannot demonstrate race discrimination in its January 10, 2019 firing or point to evidence of retaliation arising from her alleged January 4, 2019 complaints to the State Employee Assistance Program.[79] The Hospital argues Ms. Gillis fails to present a prima facie race discrimination claim because Mr. McCullough is not "similarly situated."[80] The Hospital concedes both Ms. Gillis and Mr. McCullough served as Forensic Security Employee Trainees on probationary status. Both witnessed different staff member-patient incidents, gave witness statements inconsistent with surveillance footage of the incidents, and both received Pre-Disciplinary Conferences about their inconsistent statements.[81] But Mr. McCullough gave a second witness statement conforming to the surveillance footage.[82] He did not deceive a second time. The Hospital argues it disciplined Mr. McCullough differently because Mr. McCullough violated a different Policy and his first witness statement during his Pre-Disciplinary Conference.[83] Mr. McCullough's Policy violation carried a less severe punishment than Ms. Gillis's Policy violation.[84] The Hospital argues even if Ms. Gillis presented a prima facie race discrimination claim her violation of Hospital Policy serves as a legitimate, non-discriminatory reason for her firing.[85] The Hospital counters Ms.

Gillis's retaliation claim arguing the Hospital never received Ms. Gillis's State Employee Assistance Program complaint.[86]

Ms. Gillis did not respond to the Hospital's motion.

### A. Ms. Gillis does not present a genuine issue of triable fact requiring we grant summary judgment dismissing her race discrimination claim.

Ms. Gillis alleges the Hospital discriminated against her by not firing "similarly situated" Mr. McCullough, a white male Forensic Security Employee, for also violating Hospital Policy. The Hospital counters Mr. McCullough is not "similarly situated" to Ms. Gillis because he cured his truthfulness Policy violation by recanting his first witness statement to conform to the surveillance footage events and Mr. McCullough lacked earlier warnings from the Hospital. The Hospital argues even if we found Mr. McCullough is "similarly situated" to Ms. Gillis, the Hospital had a legitimate, nondiscriminatory reason for firing Ms. Gillis. Ms. Gillis's more serious Policy violations prevent us from finding Mr. McCullough is "similarly situated" to Ms. Gillis. We grant the Hospital summary judgment on Ms. Gillis's race discrimination claim.

### 1. Ms. Gillis adduced no evidence of circumstances giving rise to an inference of unlawful discrimination as Mr. McCullough is not similarly situated.

An employee alleging race-based employment discrimination claims must first present a prima facie case of race discrimination.[87] If she does, the employer must then demonstrate a "legitimate, nondiscriminatory reason" for firing the employee.[88] If it does, we then study whether the employee adduced competent evidence the employer's demonstrated "nondiscriminatory reason" is "pretext[ual]."[89]

An employee can present a prima facie case of race-based employment discrimination by demonstrating "(1) she belongs to a protected class; (2) she is qualified for the position; (3) she suffered some form of adverse employment action; and (4) the adverse employment action

occurred under circumstances that give rise to an inference of unlawful discrimination, because, for example, the employer treated similarly situated employees not in the plaintiff's protected class more favorably."[90]

The Hospital does not dispute Ms. Gillis satisfies the first three elements of a prima facie race discrimination claim. The dispute instead focuses on whether the Hospital's firing occurred under circumstances giving rising to an inference of unlawful discrimination based on the Hospital's discipline of white probationary employee Mr. McCullough.[91]

We need to evaluate whether Ms. Gillis and Mr. McCullough are similarly situated at the Hospital.  Similarly situated employees do not need to be "identically situated" but must be similar "in all relevant respects."[92] We, in studying claims involving similarly situated employees, consider whether the employees shared the same supervisor, the employer held the employees to the same standards, the employees' respective job responsibilities, and "the nature of the misconduct."[93] The employee's misconduct "must be of comparable seriousness" to be considered "similarly situated."[94] The existence of differentiating or mitigating circumstances in either the employees' conduct or the employer's treatment of the employees bears on the similarly situated analysis.[95] Whether two employees are "similarly situated" is often a question of fact unless "there is no evidence from which a jury could conclude the parties were similarly situated."[96]

Several persuasive decisions serve as our guideposts. Chief Judge Stengel denied Lancaster County summary judgment in part because a Puerto Rican employee demonstrated similarly situated white employees violated the same email policy.[97] The Puerto Rican employee in *Abdul-Latif* worked as a case manager in Lancaster's Employment and Training Agency.[98] The Executive Director of the Employment and Training Agency created a policy preventing

employees from using their work email accounts for "non-work related purposes."[99] The Puerto Rican employee used her County email to print forms for her perfume business.[100] The County fired the Puerto Rican employee for violating the policy against using her County email for non-work related purposes.[101] The Puerto Rican employee presented evidence other County employees used their County email to send political images and mock Spanish speaking welfare recipients.[102] Chief Judge Stengel denied summary judgment finding the white employees were similarly situated to the Puerto Rican employee because both used their work emails for non-work related purposes despite sending messages with differing content.[103]

We are guided by Judge Rodriguez granting summary judgment to an engineering company employer because the allegedly "similarly situated" white employees engaged in lesser violations of the company's policy than did the Black employee.[104] The engineering company in *Penn* suspended a Black employee for five days for violating the company's safety policy.[105] The Black employee sued the engineering company alleging race discrimination for his suspension arguing the engineering company treated several "similarly situated" white employees more favorably despite "similar misconduct."[106] Judge Rodriguez noted only two of the pleaded white employees could be considered "similarly situated" because they worked in the same group as the Black employee, worked under the same supervisor as the Black employee, and engaged in "comparable misconduct."[107] Judge Rodriguez granted the engineering company summary judgment finding the white employee "did not violate one of the Life Saving safety rules" the Black employee did.[108] Judge Rodriguez reasoned these differing violations explained the differential treatment of a verbal warning afforded the white employee.[109]

We are also guided by Chief Judge Conti granting summary judgment for a pharmaceutical company employer because the sales representative's comparator employees did

not violate company policy by falsifying records.[110] The pharmaceutical company in *Palamides* followed an employee handbook warning sales representative's falsifying records of physician contact resulted in "discipline, up to and including termination."[111] The pharmaceutical company fired an older sales representative for falsifying call records.[112] The sales representative sued alleging age discrimination arguing the pharmaceutical company treated similarly situated younger sales representatives differently by not firing them for failing to timely log physician phone call records.[113] Chief Judge Conti granted the pharmaceutical company summary judgment because there is no similarity between failing to timely log physician calls and "intentionally falsif[ying] records."[114]

The degree to which an employee falsely reports information to her employer among alleged comparator employees impacts our analysis of discrimination claims.[115] For example, an older automobile maintenance worker in *Connell* sat in the automobile processing company's cars during work hours instead of completing his assigned tasks.[116] The automobile processing company reviewed surveillance footage of the maintenance worker's shifts and determined the maintenance worker spent 342 minutes sitting in the vehicle and ignoring his tasks.[117] An older maintenance worker sued the company arguing its decision to suspend and not fire younger maintenance workers for similar time-wasting constituted age discrimination.[118] Judge Joyner granted the employer summary judgment finding the younger employees' engaged 84 minutes of "time theft" and holding this disparate level of time theft constituted "distinguishable conduct result[ing] in distinguishable discipline."[119]

Ms. Gillis did not adduce evidence Mr. McCullough engaged in comparably serious misconduct allowing us to find Mr. McCullough is similarly situated to Ms. Gillis. The Hospital charged Ms. Gillis and Mr. McCullough with the same violations of its Policy.[120] But then

changed the charge against Mr. McCullough after he recanted his earlier false statement. These different violations carry different recommended disciplinary actions.[121] Ms. Gillis gave a witness statement inconsistent with the Hospital's surveillance footage of her patient incident and, when confronted, reaffirmed her inconsistent witness statement.[122] Mr. McCullough first gave a witness statement inconsistent with the Hospital's surveillance footage but then recanted the statement when confronted and provided a statement consistent with the footage.[123] Ms. Gillis and Mr. McCullough's different violations are like those considered by Judge Rodriguez in his grant of summary judgment in *Penn* and unlike those considered by Chief Judge Stengel in *Abdul-Latif*. Our Court of Appeals requires employees trying to demonstrate co-employees are similarly situated must present evidence they engage in comparably serious misconduct.[124] Ms. Gillis fails to do so because the Hospital's stated Policy concerning Mr. McCullough and Ms. Gillis's respective violations carries different levels of discipline.

But we could not find genuine issues of triable facts even if we disregarded the Hospital's Policy and considered Ms. Gillis and Mr. McCullough's instances of false witness statements as similar misconduct. Mr. McCullough gave one false witness statement while Ms. Gillis gave multiple false witness statements and declined to correct her statement when questioned. Ms. Gillis's repeated false witness statements as compared to Mr. McCullough's singular false witness statement are like the disparate instances of time theft Judge Joyner reviewed in *Connell*. Like Judge Joyner, we decline to find employees engaging in dissimilarly frequent policy-violating behavior as "similarly situated" sufficient to assert a prima facie case of employment discrimination. Ms. Gillis fails to present a prima facie case of race discrimination irrespective of whether we disregard the Hospital's employee Policy.

### 2. Violating the Hospital's honesty Policy is a legitimate, nondiscriminatory reason for firing Ms. Gillis and Ms. Gillis does not adduce facts suggesting pretext.

Ms. Gillis does not allege or adduce evidence demonstrating the Hospital used her Policy violations as pretext for firing her. The Hospital argues even if we find Ms. Gillis presents a prima facie case of race discrimination, we must grant summary judgment because violating employer policy is a "legitimate, nondiscriminatory reason" for firing an employee. Violating employer policy is a "legitimate, nondiscriminatory reason" requiring we grant the Hospital summary judgment on Ms. Gillis's race discrimination claim.

The burden shifts back to the employer once an employee presents a prima facie case of race discrimination.[125] The employer must "articulate some legitimate, nondiscriminatory reason for the employee's [firing]."[126] The employer satisfies this requirement by introducing evidence permitting the conclusion "there was a nondiscriminatory reason for the [firing]."[127] If the employer presents a "legitimate, nondiscriminatory reason" the burden shifts back to the employee to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were pretext."[128] Violating the employer's policy is a "legitimate, nondiscriminatory reason" in the discrimination and retaliation context.[129]

Ms. Gillis's violations of the Hospital's Policy constitute a "legitimate, nondiscriminatory reason" for her firing. The burden shifts back to Ms. Gillis to adduce facts the Hospital used her Policy violations as "pretext" for firing her. But Ms. Gillis neither alleges nor adduces these facts. Ms. Gillis fails to create a genuine issue of triable fact because she does not present facts other than pointing to the Hospital's discrepancy in disciplining Mr. McCullough for a different violation of Hospital Policy.

We grant the Hospital summary judgment on Ms. Gillis's race discrimination claim because she fails to adduce facts countering the Hospital's "legitimate, nondiscriminatory reason" for firing her.

**B. Ms. Gillis does not present a genuine issue of triable fact on her retaliation claim.**

Ms. Gillis alleges the Hospital retaliated against her by firing her six days after she allegedly complained of harassment to the State Employment Assistance Program. The Hospital counters it did not know of her harassment complaint when it fired her and she cannot adduce contrary evidence. The Hospital swears it has no evidence of the complaint.[130] The Hospital argues Ms. Gillis's violation of Policy constitutes a "legitimate, nondiscriminatory" reason for firing her. Ms. Gillis does not adduce evidence the Hospital or any decisionmakers knew of her State Employment Assistance Program complaint. Ms. Gillis neither alleges nor adduces evidence her violations of the Hospital's Policy served as "pretext" for her firing.

We must grant the Hospital summary judgment and dismiss the retaliation claim because Ms. Gillis fails to present evidence the Hospital knew about her harassment complaint to a state agency when it fired her for violating the Hospital's honesty Policy.

**1. Ms. Gillis adduces no facts the Hospital or a decisionmaker knew of her alleged harassment complaint to a state agency.**

Congress allows employees to sue their employer for retaliatory adverse actions after protected activity.[131] An employee presents a prima facie case for retaliation by showing "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."[132] Our Court of Appeals requires employees asserting employment retaliation claims present evidence the decisionmakers in the firing are aware of the employee's complaint at the time of the firing.[133]

We grant the Hospital summary judgment on this remaining retaliation claim. Ms. Gillis adduced no evidence Hospital Director Richard Szczurowski or a decisionmaker at the Hospital knew about her alleged January 4, 2019 complaint to the State Employment Assistance Program. Ms. Gillis amended her Complaint alleging Director Szczurowski knew about her State Employment Assistance Program complaint.[134] But she failed to present evidence Director Szczurowski knew about her complaint before the Hospital fired her. Ms. Gillis also failed to present evidence Director Szczurowski operated as a decisionmaker in her firing. Ms. Gillis also failed to present evidence of her complaint to the State Employment Assistance Program. We have not seen this complaint. We are unaware of Director Szczurowski's role in Ms. Gillis's termination after reviewing record evidence. But Director Szczurowski did not sign the termination letter and is not copied on the termination letter.[135] The Hospital swears it has no evidence of Ms. Gillis's State Employment Assistance Program complaint.[136] Ms. Gillis's failure to present counter evidence the Hospital knew of her State Employment Assistance Program complaint requires we grant the Hospital summary judgment on her retaliation claim.

> **2. Violating the Hospital's Policy is a legitimate, nondiscriminatory reason for firing Ms. Gillis requiring we grant summary judgment on her retaliation claim.**

Like discrimination claims, once the employee presents a prima facie case for retaliation the burden shifts back to the employer to "articulate a legitimate, nondiscriminatory reason" for firing the employee.[137] The employee must present evidence the purported "legitimate, nondiscriminatory reason" constituted "pretext" to survive summary judgment on a retaliation claim.[138] Our Court of Appeals instructs violating an employer's Policy is a "legitimate, nondiscriminatory reason" in the retaliation context.[139]

Ms. Gillis's violations of the Hospital's Policy constitute a "legitimate, nondiscriminatory reason" for her firing. The burden shifts back to Ms. Gillis to adduce facts the Hospital used her Policy violations as "pretext" for firing her. But Ms. Gillis neither alleges nor adduces these facts. Ms. Gillis fails to create genuine issues of triable fact because she does not present facts. We grant the Hospital summary judgment on Ms. Gillis's retaliation claim because she fails to adduce facts overriding the Hospital's "legitimate, nondiscriminatory reason" for firing her.

## III.   Conclusion

We grant the Hospital's motion for summary judgment. We find no genuine issue of triable fact as to Ms. Gillis's race discrimination claim. She and Mr. McCullough are not similarly situated employees as it relates to their conduct and resulting discipline. They received differing discipline for different violations of Hospital Policy. Even if we found Ms. Gillis and Mr. McCullough are similarly situated, Ms. Gillis does not allege or adduce evidence her violation of Hospital Policy operated as pretext for her firing. We find no genuine triable fact as to Ms. Gillis's retaliation claim. Ms. Gillis only alleges she filed a complaint with the State Employment Assistance Program. She does not adduce evidence of her complaint or whether an employee at the Hospital knew of her complaint before firing her based on an investigation begun several weeks before an alleged complaint.

---

[1] Norristown State Hospital appended exhibits to its motion.   *See* ECF No. 55 to 55-1 ("Norristown App'x").

[2] ECF No. 55 at 1; ECF No. 55-1 at 67.

[3] ECF No. 55 at 1; *see* ECF No. 55-1 at 12.

[4] ECF No. 55 at 1, ECF No. 55-1 at 100-18.

[5] ECF No. 55-1 at 99, 132.

[6] *Id.* at 132.

[7] *Id.* at 99.

[8] *Id.* at 154.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at 36.

[15] *Id.*

[16] *Id.* at 37, 39.

[17] *Id.* at 12.

[18] *Id.* at 15.

[19] *Id.*

[20] *Id.* at 153.

[21] *Id.* at 161.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 18.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at 153.

[29] *Id.* at 20.

[30] *Id.*

[31] *Id.* at 153.

[32] *Id.*

[33] *Id.*

[34] ECF No. 5 at 15-16.

[35] *Id.* at 16.

[36] *Id.*

[37] *Id.* at 11.

[38]  *Id.* We dismissed Ms. Gillis's retaliation claims involving informal complaints to her supervisors on May 15, 2023 finding Ms. Gillis failed to allege a decisionmaker knew about her November 2018 complaints and Ms. Gillis failed to connect her alleged complaints to her January 2019 termination. ECF No. 18 at 11-12.

[39] ECF No. 55-1 at 15.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 17.

[43] *Id.* at 153.

[44] ECF No. 5 at 19.

[45] ECF No. 42.

[46] *Id.*

[47] *Id.*

[48] ECF No. 40 at 2-3.

[49] ECF No. 55-1 at 13.

[50] *Id.* at 14.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 13.

[54] *Id.*

[55] *Id.* at 73.

[56] *Id.* at 159.

[57] *Id.*

[58] *Id.* at 78.

[59] *Id.*

[60] *Id.* at 75.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* at 77.

[65] *Id.*

[66] *Id.* at 73.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *See* ECF No. 55-1.

---

[72] ECF No. 5 at 19.

[73] ECF No. 22 at 3.

[74] ECF No. 2; *see* ECF No. 42. We construed Ms. Gillis's letter to us as an amended complaint adding the retaliation claim. ECF No. 43.

[75] ECF No. 2 at 7.

[76] ECF Nos. 42, 42-1.

[77] ECF No. 18 at 11-12.

[78] ECF No. 19.

[79] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

[80] ECF No. 53 at 8-11.

[81] *Id.* at 10.

[82] *Id.* at 10.

[83] *Id.* at 10, n.2, n.3; ECF No. 55-1 at 77-78.

[84] *Compare* ECF No. 55-1 at 132 (recommending firing an employee for Deliberate Concealment or Misrepresentation of Information) *with* ECF No. 55-1 at 99 (recommending issuing a written warning to an employee for Failure to Follow General Instructions or Procedures).

[85] ECF No. 53 at 13-17.

[86] *Id.* at 11-13.

[87] *Vaughan v. Boeing Co.*, 733 Fed. App'x 617, 622 (3d Cir. 2018).

[88] *Id.*

[89] *Id.*

[90] *Collins v. Kimberly-Clark Pennsylvania, LLC*, 708 Fed. App'x 48, 52 (3d Cir. 2017).

[91] ECF No. 53 at 8-11.

[92] *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014).

[93] *Id.* at 526.

[94] *White v. Purolite Corp.*, No. 19-1736, 2020 WL 5294238, at *3 (E.D. Pa. Sept. 4, 2020) (quoting *Opsatnik v. Norfolk S. Corp.*, 335 Fed. App'x 220, 223 (3d Cir. 2009)).

[95] *Opsatnik*, 335 Fed. App'x at 223.

[96] *Abdul-Latif*, 990 F. Supp. 2d at 526 (E.D. Pa. 2014).

[97] *Id.* at 527.

[98] *Id.* at 522-23.

[99] *Id.* at 524.

[100] *Id.* at 526.

[101] *Id.* at 523.

[102] *Id.* at 524.

[103] *Id.* at 527.

[104] *Penn v. ExxonMobil Rsch. & Eng'g Co.*, No. 17-3140, 2019 WL 4745253, at *7 (D.N.J. Sept. 30, 2019).

[105] *Id.* at *4.

[106] *Id.* at *6.

[107] *Id.* at *6.

[108] *Id.* at *6.

[109] *Id.* at *6.

[110] *Palamides v. Boehringer Ingelheim Pharms., Inc.*, No. 07-1696, 2011 WL 1044641, at *13 (W.D. Pa. Mar. 18, 2011).

[111] *Id.* at *4.

[112] *Id.* at *9.

[113] *Id.* at *13.

[114] *Id.* at *13.

[115] *Connell v. Penn Auto Team*, No. 19-3833, 2021 WL 2400717 (E.D. Pa. June 11, 2021).

[116] *Id.* at *1.

[117] *Id.* at *1-2.

[118] *Id.* at *4.

[119] *Id.*

[120] *Compare* ECF No. 55-1 at 132 (recommending firing an employee for Deliberate Concealment or Misrepresentation of Information) *with* ECF No. 55-1 at 99 (recommending issuing a written warning to an employee for Failure to Follow General Instructions or Procedures).

[121] *Id.*

[122] ECF No. 55-1 at 17, 153.

[123] *See* ECF No. 53 at 10, n.2, n.3; ECF No. 55-1 at 77-78.

[124] *Opsatnik v. Norfolk S. Corp.*, 335 Fed. App'x 220, 223 (3d Cir. 2009).

[125] *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 649 (E.D. Pa. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

[126] *Id.*

[127] *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994).

[128] *Branch*, 554 F. Supp. 3d at 649.

[129] *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 658 (E.D. Pa. 2018).

[130] ECF No. 40.

[131] *Selvato v. SEPTA*, 658 Fed. App'x 52, 56 (3d Cir. 2016).

[132] *Id.*

[133] *Sanchez v. SunGard Availability Servs. LP*, 362 Fed. App'x 283, 288 (3d Cir. 2010).

[134] ECF No. 42.

[135] ECF No. 55-1 at 14.

[136] ECF No. 40.

[137] *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 657 (E.D. Pa. 2021).

[138] *Id.*

[139] *Capps v. Mondelez Glob.*, LLC, 847 F.3d 144, 152 (3d Cir. 2017).